**THE TOSCANO LAW FIRM, LLC**
**80 Bloomfield Avenue**
**Suite 101**
**Caldwell, New Jersey 07006**
**Phone: (973) 226-1691**
**Facsimile: (973) 226-1693**
**E-mail:** ptoscano@pptlawfirm.com

Attorney for Plaintiff

## IN THE
## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIEUTENANT GRISSEL NIEVES-HALL, | |
| Plaintiff, | |
| v. | |
| CITY OF NEWARK, DIRECTOR ANTHONY AMBROSE and CAPTAIN CAMILO MOS, | **COMPLAINT** |
| Defendants. | |

## THE PARTIES

1. The plaintiff, Grissel Nieves-Hall, at all times relevant hereto, was an employee for years with Defendant, City of Newark's Police Department (NPD), currently holding the rank of Lieutenant of Police.

2. Defendant, City of Newark (Newark), is a municipal corporation and, at all relevant times mentioned herein, served as plaintiffs' employer and ran, by funding, hiring, retaining, teaching, monitoring, terminating, administering to and staffing, the NPD. By and through its abject deliberate indifference over the last several years within and toward the NPD, Newark has fostered an atmosphere and, accordingly, has unequivocally and without a doubt established a "policy" within the NPD that allows for an recognized

       pattern of illegal treatment of various officers, and therefore has ratified/adopted a *Monell* "policy, pattern and practice" within the NPD which endorses, sanctions, condones, overlooks and tolerates the below recited treatment.

3. Defendant, Anthony Ambrose (Ambrose), at all relevant times mentioned herein, served as Director of Public Safety for defendant City of Newark, and as the plaintiff's ultimate superior within the police department. Upon information and belief, Ambrose has allowed Mos to essentially do whatever he (Mos) wants to do to the plaintiff, without taking any punitive or administrative action toward Mos at any time. By virtue of same, he has approved, endorsed, sanctioned and ratified, plainly and/or tacitly Mos' conduct toward the plaintiff at all relevant times mentioned hereinafter.

4. Defendant, Camilo Mos (Mos), at all relevant times mentioned herein, served as Captain of Police for defendant City of Newark, and as the plaintiff's immediate supervisor within the NPD.

## JURISDICTION OF THIS UNITED STATES DISTRICT COURT

5. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. Secs. 1331, 1343 (3) and (4), 42 U.S.C. Secs. 1983 and 1988 and the First Amendment to the United States Constitution which guarantees Freedom of Speech and Freedom of Assembly.

## FACTUAL AVERMENTS RELEVANT TO ALL CLAIMS FOR RELIEF

6. Plaintiff Nieves-Hall is a highly valued and esteemed employee with the NPD since her hiring on February 27, 1995. She has risen through the promotional ranks based upon sheer merit, worth, distinction, virtue and excellence. The plaintiff has no disciplinary history whatsoever to speak of, and currently holds the rank of Lieutenant, as mentioned above. Her professional reputation is impeccable, unimpeachable, flawless and unsullied;

    her work record is pristine/developed and her history in the NPD includes myriad awards and commendations. She is a credit to the NPD and all of her colleagues within the NPD, (save for defendant Mos) look upon her as an excellent, diligent and conscientious law enforcement officer. She has that same reputation with outside law enforcement agencies as well.

7. Of critical/vital importance to this cause of action is the fact that the plaintiff was also a very outspoken supporter of past Newark mayoral candidate Shavar Jeffries (Jeffries), at all times exercising her US Constitutional First Amendment Freedom of Speech and Assembly protections in so speaking out and supporting Jeffries, who defendant Ambrose did not support. Indeed, upon further information and belief, Ambrose supported Ras Baraka for Mayor, who appointed Ambrose to his current position.

8. The plaintiff's support of Jeffries also included her lawful appearance in a commercial endorsing Jeffries' Mayoral candidacy.

9. Defendant Newark has allowed defendants Ambrose and Mos to abuse, harass, humiliate, excoriate, denounce, castigate, exploit, degrade, debase (and impetuously transfer) the plaintiff for several years now, without properly or thoroughly monitoring their activities or investigating the plaintiff's complaints she sent up the chain of command (pursuant to the NJCEPA), and that she had validly lodged against them.

10. Additionally, Newark has recklessly/purposely/grossly negligently and with deliberate indifference allowed Ambrose and Mos to retaliate against the plaintiff and to make the plaintiff's day to day life within the NPD virtually impossible, intolerable and unbearable. Essentially, Newark has developed, allowed and maintained an atmosphere of lawlessness within the NPD.

11. Furthermore, Newark has allowed Ambrose and Mos, with blatant, unconcealed and flagrant deliberate indifference, to essentially treat the plaintiff in any fashion they desire, without stepping in or curbing their opprobrious conduct toward this fine officer because of her past/strong support of Jeffries.

12. The plaintiff's nightmare within the NPD began in/around April 16, 2016, and has continued, uninterrupted, to the current day. This continuing and unrelenting course of tortious conduct by all defendants herein triggers the ***Roa v. Roa*** continuing tort doctrine.

13. On that day, while diligently performing various law enforcement related functions, defendant Mos, in an entirely unprofessional and puerile fashion, began to curse and scream at the plaintiff because she refused to follow his illegal order. When she attempted to explain the illegality of his order to him, he refused to listen. This was the first time the plaintiff realized that Mos had some sort of preconceived/warped/twisted/perverted and irrational bent/propensity toward her. Prior to this day, the plaintiff enjoyed a hostile-free workplace environment at the NPD.

14. Thereafter, on May 4, 2016, the plaintiff received numerous calls from defendant Mos regarding a prisoner watch at UMDNJ in Newark. On that day, Mos ordered the plaintiff to "go to the fucking hospital and find out" certain things about that prisoner. Again, the fashion in which Mos spoke to and degraded the plaintiff was perplexing, hostile, uncalled for and confounding.

15. On August 24, 2016, the plaintiff was promoted to the rank of Lieutenant and was assigned to the police academy, so she was in fact at that time away from and had no contact with Mos. This change she both welcomed and needed badly. However, Mos essentially laid in wait for any opportunity to continue his illegal, abusive and vicious treatment toward her.

16. And nevertheless and notwithstanding that hiatus, from the months of March through October, 2016, the plaintiff received several (and truly unnecessary) phone calls from Mos wherein Mos spoke to her in a highly unprofessional, dishonorable and vicious tone, which left the plaintiff in a virtual state of disbelief each and every time she hung up the phone. It was evident that Mos was entirely out of control.

17. On October 5, 2016, while working a specific police detail, the plaintiff received a phone call from Mos, wherein Mos continued his usual and customary tirade toward her, directing her to take a police action – when the plaintiff attempted to rationally and sensibly explain to Mos that what he was directing her to do was a pragmatic impossibility, Mos replied "I don't want to hear any fucking excuses, I'm the Captain, make it happen". Mos then hung up the phone on her.

18. On October 7, 2016, the plaintiff was ordered to Mos' office to hand to him reports he previously ordered of her. After reading a second report, Mos became visibly distraught and upset, and stated "what the fuck is this, I didn't ask you for this report". Mos' mercurial, unpredictable and downright insanity toward the plaintiff continued, in earnest. Plaintiff remained calm, cool and collected, despite Mos' exceedingly unprofessional attitude and treatment toward/of her. Mos then stood up in a clear and unmistakable threatening manner (which the plaintiff believed to be an unmistakable and provable violation of N.J.S.A. 2C: 12-1, 2C: 33-2 and 2C: 33-4), began to scream at her yet again (which was then, by that time, a common and chronic occurrence) and said "I think you don't like taking orders from me, it's just me and you here, I'm going to charge you with insubordination, I don't need problems from you, you are a fucking problem like the rest of them". The plaintiff was perplexed, baffled and confounded.

19. Mos continued – he also stated "I don't need you, you can do whatever you want, I don't need you". The plaintiff responded, in a low and controlled tone, albeit brought to the brink of tears, that Mos should "visit" his "conscience" and realize how hard a worker she was. Hearing virtually nothing in response, the plaintiff then advised Mos that she would be requesting a transfer from his command. This is when the hostile work environment noticeably became increasingly heightened.

20. From in/about April, 2016, up to and including the date of the filing of the within complaint, Mos has utilized patrolman within the NPD to give the plaintiff instructions of what he wanted done, which was purposely done to undermine, subvert and destabilize the plaintiff's authority with the department, as well as to ruthlessly embarrass her.

21. In other instances, Mos would use a field sergeant, subordinate to the plaintiff, to communicate with the plaintiff, at one time going so far as to order a sergeant to snap a picture of the order he (Mos) issued to the plaintiff (through that sergeant) with his cell phone so it could be used at a later date against the plaintiff if necessary – of course, this was never necessary.

22. Defendant Ambrose was aware of all that was being done to the plaintiff and, with apparent deliberate indifference thereto, abandoned the plaintiff and let her continue to be subjected to Mos' relentless, unyielding, persistent and inexorable wrath and excoriation.

23. As if the above rancorous day to day treatment foisted upon the plaintiff by Mos was not enough, the work environment/atmosphere nevertheless became even worse.

24. As a result, the plaintiff requested, in writing, that the Newark Office of Affirmative Action (OAA) investigate her complaints she made against Mos. The Newark OAA refused to do so, instead advising the plaintiff that the NPD already took action to deal

with Mos' conduct toward her. However, this was simply false. The NPD took no true and valid action at all.

25. The NPD then began a bogus/ sham internal affairs investigation of Mos to "cover" itself, without truly interviewing any witnesses the way they were mandated to do pursuant to the NJSAGG, IAPP's, and summarily closed out that mock investigation after merely a few people were questioned.

26. Somehow, things became even worse. In April, 2018, the Captain and new Commander of the sixth precinct asked the plaintiff to work for him, under his command. The plaintiff readily accepted, but Ambrose denied same. No reason was given.

27. Around that same point in time, the plaintiff was advised that she was recommended to be executive officer of the communications division. However, this too was likewise denied by Ambrose. No reason was given.

28. Just prior to the filing of the within complaint, the plaintiff received a call from another Captain, asking her if she would like to be his executive officer at the Special Victim's Division. The plaintiff's name was submitted to Ambrose who, for the third time, denied same. No reason was given.

29. It was at that time that the plaintiff genuinely, precisely and accurately realized that almost all of the above recited treatment toward her was a direct result of her staunchly supporting and voicing her support for Jeffries, the above mentioned past Newark Mayoral candidate.

30. The above recitation/course of conduct was purposely meant to be retaliatory, vengeful, punitive, harassing and distressing toward the plaintiff, and was intentionally foisted upon the plaintiff daily by Mos, at the direction/with the tacit approval of Ambrose, all in a concerted and pre-planned effort to force the plaintiff to resign from the NPD, again

simply in direct (and sometimes circuitous) retaliation for her past support of Jeffries. This blatant/egregious constitutional violation was both astonishing and beyond belief.

31. Perhaps most astounding, however, (and as alluded to above) is the pure/unadulterated point (from which time all else seemingly flowed) that the plaintiff was originally transferred to the first precinct because of her loyalty and support of Jeffries – in point of fact, the deputy chief at that time called her into his office and specifically advised her that she "came with instructions and could only be assigned to an afternoon shift". **This was immediately after Baraka defeated Jeffries in the Mayoral election**.

32. This statement by the deputy chief was beyond belief, and left the plaintiff both dumbstruck and speechless, as she believed that her federal constitutional rights to speak in support of, and assemble freely with, the mayoral candidate of her choice would not be illegally, unlawfully, improperly, and/or illicitly utilized against her thereafter by the defendants in an attempt to force her out of the NPD.

## SPECIFIC CAUSES OF ACTION

### COUNT ONE

### (42 USC 1983 – AS AGAINST ALL DEFENDANTS)

33. Plaintiff incorporates Paragraphs 1 through 32 as if fully recited herein.

34. In unambiguous and unmitigated violation of 42 U.S.C. 1983, all defendants, while acting under color of law, violated the plaintiff's US Constitutional First Amendment Rights of Freedom of Speech and Freedom of Assembly by their actions alluded to hereinabove.

## COUNT TWO

### (NEW JERSEY CIVIL RIGHTS ACT, N.J.S.A. 10:6-2(C) – AS AGAINST ALL DEFENDANTS)

35. All defendants have violated the plaintiff's rights under the New Jersey State Constitution, as the plaintiff had the right to work in the NPD absent any political interference or penal consequences for her outspoken and voiced support of a certain past Newark mayoral candidate. Furthermore, the plaintiff possessed the state constitutional right to due process of law, equal protection of the law, right to freely speak, write and publish her sentiments absent abuse and to freely express her opinions.

36. The plaintiff has been denied these state civil rights by the defendants for no valid, justifiable, proper or lawful reason.

37. Further, and as stated above, to this very day, the plaintiff has also openly voiced her objection to all of the aforementioned treatment, and her exercising her freedom of speech and freedom of association rights has been and continues to be abrogated sorely and illegally as a result thereof.

38. Moreover, pursuant to the NJCRA, the plaintiff had a state constitutional right to make known to Newark, Ambrose and Mos her grievances and valid complaints, and also enjoyed the state constitutional right to be loyal to and associate with a past Newark mayoral candidate without fearing work-related reprisals for doing so.

39. When the plaintiff exercised these rights, Newark did nothing to rectify these illegal and improper actions perpetrated by Ambrose and Mos.

40. Moreover, the defendants acted under color of state law and also deprived the plaintiff, through threats, intimidation and/or coercion, of the exercise and enjoyment of her substantive due process and other rights under the NJCRA.

## COUNT THREE

### (VIOLATION OF THE NJCEPA, N.J.S.A. 34:19-1 et seq. – AS AGAINST ALL DEFENDANTS)

41. The plaintiff is and was at all relevant times an "Employee" as defined in N.J.S.A. 34:19-2(b).

42. Defendants are and at all times were "Employers" as defined in N.J.S.A. 34:19-2(a). Defendants Ambrose and Mos are also "Supervisors" as defined in N.J.S.A. 34:19-2(d).

43. Plaintiff engaged in protected activity as specifically laid out above when she made/authored complaints, reports, letters, and/or similar documents with Newark and to her supervisors regarding, and/or disclosed or threatened to disclose, activities, policies or practices of Mos and her employer she reasonably believed to be in violation of law, rule and/or a regulation promulgated pursuant to law, including, without limitation, the defendants' consistent and continuing violations of the New Jersey State Constitution and the statutes, regulations, case law and policies governing other employment protocol and procedure.

44. Plaintiff also engaged in protected activity by reason of her objection to and refusal to participate in defendants' activities, policies and/or practices described above that she reasonably believed to be a violation of law, rule, or regulation, were fraudulent and/or criminal; or were incompatible with a clear mandate of public policy regarding public safety, health and welfare.

45. As set forth above, and in retaliation for the plaintiff "blowing the whistle" and engaging in protected activity, Newark, Ambrose and Mos took numerous and continuous adverse and egregious employment actions, and engaged, and continue to engage, in a pattern of continuous and systematic retaliatory conduct and reprisals against the plaintiff, and

subjected the plaintiff thereby to a continuing and extremely hostile and harmful work environment, as well as engaged actions deliberately intended to injure the plaintiff and materially affect the terms and conditions of her employment and to hinder and ruin her ability to advance and the opportunities available to her, which adverse actions have continued up to the date this action was commenced. Said adverse employment actions were causally related to the plaintiffs' protected whistleblowing activities.

46. Ambrose and Mos are assuredly considered upper management in the City of Newark and their wrongful conduct was deliberately designed and intended to injure the plaintiff and/or was committed with knowledge of or with reckless indifference to a high degree of probability of harm to the plaintiff. Defendants Ambrose and Mos at all times acted within the scope of their employment. Upper management thus participated in the unlawful employment acts or was willfully indifferent to the plaintiff.

47. Defendant City of Newark was fully aware and was deliberately indifferent to, or should have known, of the harassment, abuse and misconduct foisted by its employees Ambrose and Mos upon the plaintiff. It granted Ambrose and Mos authority to control the working environment and conditions which authority, as set forth above, was abused and misused by Ambrose and Mos, who acted within the scope of their employment by the City. Defendant Newark failed negligently, recklessly, and/or deliberately to have, properly enforce or obey a policy or mechanism for supervising and overseeing Ambrose and Mos, that precludes such ultra vires, improper and retaliatory conduct and/or inaction and that provides for a meaningful and effective procedure for investigation and remediation of such misconduct. The City's actions, as well as its inactions, only encouraged, emboldened, facilitated and assisted the wrongdoing of Ambrose and Mos.

48. Because of the adverse actions taken in retaliation against her and the hostile environment these actions created, Nieves-Hall was forced by defendants' misconduct to endure severe, continuous and pervasive humiliation, embarrassment, harassment and abuse such that a reasonable person in her circumstances would believe the conditions of employment had been altered and the environment was hostile and abusive, and which no such reasonable person could be expected to endure. Plaintiff Nieves-Hall was caused to suffer, and has continued to suffer, severe emotional and physical distress and injury as well as substantial economic and financial loss.

49. As the direct and proximate result of all defendants' wrongful and unlawful retaliation, the plaintiff has been and will continue to be substantially damaged as aforesaid.

## COUNT FOUR

### (WORKER FREEDOM FROM EMPLOYER INTIMIDATION ACT, N.J.S.A. 34:19-9 – AS AGAINST ALL DEFENDANTS)

50. By and through their actions as recited hereinabove, all defendants are in direct violation of the New Jersey Worker Freedom from Employer Intimidation Act, as Ambrose and Mos, with Newark's tacit approval, required the plaintiff to participate and communicate with them, the purpose of which was to communicate Ambrose and Mos' opinions regarding the political beliefs and loyalties of both of them and the plaintiff.

51. Additionally, by acting in the above fashion, Ambrose and Mos penalized the plaintiff because she made several good faith efforts to report a violation of the New Jersey Worker Freedom from Employer Intimidation Act, and Ambrose and Mos both continue to do so to this very day.

## COUNT FIVE

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – AS AGAINST MOS)

52. The actions of defendant Mos toward the plaintiff as recited above were extreme and outrageous, and purposely done to inflict severe emotional distress upon Nieves-Hall.

53. No reasonable person in the plaintiff's position would be able to endure this reprehensible, inexcusable and unacceptable conduct by Mos, who acted with specific purpose to cause extreme and outrageous emotional distress upon the plaintiff.

54. Newark did nothing at any time to curb the opprobrious conduct of Mos toward the plaintiff over the span of the last several years.

## COUNT SIX

### (42 U.S.C. § 1983 – AS AGAINST THE CITY OF NEWARK)

55. Plaintiff Nieves-Hall repeats the allegations set forth in all preceding paragraphs.

56. Prior to the above mentioned dates, the City of Newark developed, cemented, engrained and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Newark, which eventually caused the egregious violations of the plaintiff's rights.

57. Additionally, the City of Newark failed to use reasonable care in the selection of its NPD officers, failed to properly train and/or supervise them and failed to prevent the collective violations of the plaintiff's rights.

58. Further, Newark, under color of state law, directly or indirectly approved or ratified the unlawful, malicious and wanton conduct of the defendant officers herein.

59. Moreover, Newark failed to train the defendant officers to ensure that NPD officers enjoyed a work atmosphere free from political reprisals/retaliation.

60. Unequivocally, Newark knew or should have known that the defendant officers would have to make daily decisions regarding NPD officers who have, in the past, supported certain Newark political candidates on their own free time, ensuring that these officers would not be penalized in any fashion as a result thereof..

61. Indeed, the lack of training of the defendant officers led to these officers violating the plaintiff's constitutional rights egregiously regarding/concerning her First Amendment privileges.

62. Notwithstanding the above, Newark's policy maker refused to retain or properly train its officers regarding same.

63. The lack of training and/or the inadequate training in these areas is surely tantamount to a custom and/or policy that encourages and, indeed as occurred herein, necessitates the violation of these human rights.

64. Newark's blatant and deliberate indifference herein led to the inescapable fact that if it trained its officers properly, then the within abhorrent and illegal actions would never have taken place.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff Nieves-Hall prays that this honorable Court:

(a) accept jurisdiction over this matter;

(b) empanel a jury to hear and decide this matter;

(c) award against defendants compensatory and punitive damages in a manner to be determined by a jury;

(d)     award to plaintiff the reasonable attorneys' fees and costs of this litigation; and

(e)     for such/any other relief that this Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP 38, the plaintiff herein demands a trial by jury on all counts.

## CERTIFICATION

I hereby certify, upon information and belief, that the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding.

I also certify, upon information and belief, that at the present time no other action or arbitration with respect to the matter in controversy is contemplated.

On the basis of the present knowledge, I am aware of no other party or parties who should be joined in this action.

Dated: April 12, 2019                 By:   *s/ Patrick P. Toscano, Jr.*
                                                           Patrick P. Toscano, Jr.