| | |
|---|---|
| Lieutenant Grissel Nieves-Hall, | No. 19-9755-KM-MAH |
| Plaintiff, | |
| v. | OPINION |
| City of Newark, Anthony Ambrose and Captain Camilo Mos, | |
| Defendants. | |

### KEVIN MCNULTY, U.S.D.J.:

Lieutenant Grissel Nieves-Hall of the Newark Police Department alleges First Amendment retaliation and other employment-related claims. Before the Court are three motions to dismiss her complaint for failure to state a claim, pursuant to Fed. R. Civ. P. Rule 12(b)(6), brought by defendants the City of Newark, Director of Public Safety Anthony Ambrose, and Captain Camilo Mos. (DE 3, 6, 11). For the reasons provided below, defendants' motions to dismiss are granted in part, but for the most part denied.

### I.    Factual Allegations[1]

The allegations of the complaint are assumed to be true only for purposes of this motion to dismiss.

Plaintiff Nieves-Hall is currently an employee of the Newark Police Department ("NPD"). (Compl. ¶ 6) She was hired on February 27, 1995, and

---

[1]    For ease of reference, certain key items from the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

| | |
|---|---|
| DE = docket entry number; | Compl. = Lt. Nieves-Hall's complaint (DE 1); |
| DE 3 = The City's moving brief; | DE 20 = The City's reply brief; |
| DE 6 = Director Ambrose's moving brief; | DE 19 = Director Ambrose's reply brief; |
| DE 11 = Capt. Mos' moving brief (DE 11); | DE 21 = Capt. Mos' reply brief; |
| DE 15 = Lt. Nieves-Hall's opposition. | |

has since been promoted within the NPD. She currently holds the rank of Lieutenant. (*Id.*) She has no disciplinary record and has received awards for her service. (*Id.*) Defendant Camilo Mos served as Police Captain for the City of Newark ("the City") and was Lt. Nieves-Hall's immediate supervisor. (*Id.* ¶ 4) Defendant Anthony Ambrose is the Director of Public Safety for the City. (*Id.* ¶ 3)

Lt. Nieves-Hall states that she was "a very outspoken supporter of Newark mayoral candidate Shavar Jeffries (Jeffries)" and that she exercised "her US Constitutional First Amendment Freedom of Speech and Assembly" to support Jeffries and speak out on his behalf. (*Id.* ¶ 7) Lt. Nieves-Hall asserts that she appeared in a commercial on Jeffries' behalf in which she endorsed his candidacy. (*Id.* ¶ 8) Defendant Ambrose is alleged to have been a supporter of Jeffries' opponent, Ras Baraka, who ultimately was elected mayor and appointed Ambrose Director of Public Safety. (*Id.* ¶ 7)

Lt. Nieves-Hall broadly asserts that the City has allowed Director Ambrose and Capt. Mos "to abuse, harass, humiliate, excoriate, denounce, castigate, exploit, degrade, debase (and impetuously transfer) [her] for several years now, without properly or thoroughly monitoring their activities or investigating" her complaints. (*Id.* ¶ 9) She alleges that the City allowed Director Ambrose and Capt. Mos to retaliate against her without stepping in, making her "day to day life within the NPD virtually impossible, intolerable and unbearable," and creating "an atmosphere of lawlessness within the NPD." (*Id.* ¶ 10)

More specifically, Lt. Nieves-Hall asserts that her troubles began in April 2016, in response to her support of Jeffries. (*Id.* ¶¶ 11, 12) On April 16, 2016, Capt. Mos "began to curse and scream at the plaintiff because she refused to follow his illegal order." (*Id.* ¶ 13) She does not specify what this "illegal order" was, but states that Capt. Mos refused to listen to her "attempt[] to explain the illegality of his order." (*Id.*) It was at this time, she alleges, that she realized

Capt. Mos had a "preconceived" and "irrational bent/propensity toward her." (*Id.*)

On May 4, 2016, she again received a call from Capt. Mos in which he spoke to her in a degrading manner and ordered her to "'go to the fucking hospital and find out' certain things about that prisoner." (*Id.* ¶ 14)

Despite these incidents, on August 24, 2016 Nieves-Hall was promoted to Lieutenant and was assigned to the police academy, where for some time she had no contact with Capt. Mos. (*Id.* ¶ 15)

On October 5, 2016, Lt. Nieves-Hall received another call from Capt. Mos in which he directed her "to take a police action" that she claims was a "pragmatic impossibility." (*Id.* ¶¶ 16–17) She alleges that she tried to calmly explain this to Capt. Mos; he replied, "I don't want to hear any fucking excuses, I'm the Captain, make it happen." (*Id.* ¶ 17)

Two days later, on October 7, 2016, Lt. Nieves-Hall reported to Capt. Mos's office to turn in reports. After reading one report, Capt. Mos "became visibly distraught and upset, and stated 'what the fuck is this, I didn't ask you for this report.'" (*Id.* ¶ 18). Lt. Nieves-Hall states that Capt. Mos then "stood up in a clear and unmistakable threatening manner" and continued yelling at her stating "you don't like taking orders from me, it's just me and you here, I'm going to charge you with insubordination, I don't need problems from you, you are a fucking problem like the rest of them." (*Id.* ¶ 18) Capt. Mos's behavior, in her view, constituted violations of N.J. Stat Ann §§ 2C:12-1 (assault), 2C:33-2 (disorderly conduct), and 2C:33-4 (harassment). (*Id.*) Capt. Mos is then alleged to have said "I don't need you, you can do whatever you want, I don't need you." (*Id.*) Lt. Nieves-Hall states that she then told Capt. Mos that she would be requesting a transfer from his command. (*Id.*)

Lt. Nieves-Hall asserts that after her request for a transfer, "the hostile work environment became increasingly heightened." (*Id.*) She alleges that from around April 2016 through the filing of the initial complaint in November 2018, Capt. Mos would use a patrolman or a field sergeant subordinate to her to

communicate to her and give her orders in an effort to undermine her authority and embarrass her. (*Id.* ¶¶ 20-21)

Lt. Nieves-Hall filed complaints with the Newark Office of Affirmative Action ("OAA"). (*Id.* ¶ 24) Lt. Nieves-Hall suggests that OAA refused to investigate some of her complaints, while commencing a "bogus/sham internal affairs investigation of Capt. Mos to 'cover' itself." (*Id.* ¶ 25) Lt. Nieves-Hall alleges that OAA only interviewed a few people then closed its "mock" investigation. (*Id.* ¶ 25)

Lt. Nieves-Hall alleges that Director Ambrose was aware of Capt. Mos's behavior towards her. (*Id.* ¶ 22) She also alleges that Director Ambrose failed to take any action and abandoned her so that she was still subject to Capt. Mos's behavior. (*Id.*)

From around April 2018 to November 2018, Lt. Nieves-Hall was offered new positions on three occasions, but each time was denied the position by Director Ambrose without explanation. (*Id.* ¶¶ 26-28) She states that she was first denied a transfer to the sixth precinct in April 2018, then was denied the position of executive officer of the communications division, and then just prior to filing the complaint was denied a transfer to the Special Victims' Division under a new captain. (*Id.*)

Ultimately, Lt. Nieves-Hall attributes Capt. Mos's and Director Ambrose's conduct to her support of Jeffries. (*Id.* ¶¶ 30–31) Because of this support, she says, defendants have mistreated her in an effort to get her to resign from NPD. (*Id.* ¶ 32)

On November 14, 2018, Lt. Nieves-Hall filed a complaint in Essex County Superior Court. Lt. Nieves-Hall then voluntarily dismissed her complaint without prejudice. On April 12, 2019, Lt. Nieves-Hall filed her complaint in this Court. (DE 1)

The complaint asserts six claims:

- **Count One:** First Amendment retaliation, 42 USC § 1983 (against all defendants) (Compl. ¶¶33–34);

- **Count Two:** Claim parallel to Count One under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10-6-2(C) (against all defendants) (Compl. ¶¶ 35–40);
- **Count Three:** Violation of the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1, *et seq.* ("CEPA") (against all defendants) (Compl. ¶¶ 41–49);
- **Count Four:** Violation of New Jersey Worker Freedom from Employer Intimidation Act, N.J. Stat. Ann. § 34:19-9 (against all defendants) (Compl. ¶¶ 50–51);
- **Count Five:** Intentional infliction of emotional distress (against Capt. Mos) (Compl. ¶¶ 52–54); and
- **Count Six:** First Amendment Retaliation, 42 USC § 1983 (against City of Newark) (Compl. ¶¶ 55–64).

In May 2019, each defendant moved to dismiss Lt. Nieves-Hall's complaint for failure to state a claim. (DE 3, 6, 11) Defendant Capt. Mos incorporates by reference the arguments made in the briefing of Director Ambrose and the City. (DE 11-2 at 4) Lt. Nieves-Hall opposes those motions. (DE 15)

## II. Standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to

relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank,* 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal,* 556 U.S. at 678.

III.    **Discussion[2]**

   A. **Counts 1 (All defendants) and 6 (City of Newark) – 42 U.S.C. § 1983 Claims**

      i.  **Standard**

Counts 1 and 6 of the complaint allege First-Amendment-based violations of 42 U.S.C. § 1983.

The First Amendment enshrines the right of the people to petition the government for redress of grievances. U.S. CONST. amend I. When that right is infringed upon by state—as opposed to federal—officials, Section 1983 of the Civil Rights Act of 1871 provides a remedy:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

[2]    Director Ambrose's briefs (DE 6, 19), perhaps carrying over arguments from some other case, repeatedly refer to claims that are not made by Lt. Nieves-Hall, including "constructive discharge" (DE 6-21 at 4; DE 19 at 5); "breach of implied covenant of good faith and fair dealing"; and "breach of contract" (DE 6-1 at 7–9, 15; DE 19 at 6). Indeed, Director Ambrose faults Lt. Nieves-Hall for failing to address his contract-based arguments in her brief. (DE 19 at 6) Arguments directed to claims that do not appear in the complaint will be disregarded.

42 U.S.C. § 1983. Section 1983 allows a party who has been deprived of rights, privileges, or immunities secured by the Constitution to seek damages and injunctive relief. *See id.*

Section 1983 is not in itself a source of substantive rights; it provides a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Therefore, in evaluating a § 1983 claim, a court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (*citing Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

A prima facie case under § 1983 requires a plaintiff to demonstrate that: (1) a person deprived her of a federal right; and (2) the person who deprived her of that right acted under color of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)). There is no question here that Capt. Mos and Director Ambrose allegedly acted under color of state law; they are police officials who were acting in the course of their official duties when they are alleged to have violated Lt. Nieves-Hall's rights.

### ii. Count 1 – liability under § 1983

Lt. Nieves-Hall asserts in Count 1 that all defendants violated her "US Constitutional First Amendment rights to Freedom of Speech and Freedom of Assembly" when they retaliated against her for her support of mayoral candidate Jeffries. (Compl. ¶ 34)

To assert a claim for First Amendment retaliation under § 1983, a plaintiff must allege: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).

The case law has adapted First Amendment claims to the peculiar context of public employment. "A public employee must show that, among other things, his or her speech is constitutionally protected. A statement is protected by the First Amendment if: (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Young v. Twp. of Irvington*, 629 F. App'x 352, 357 (3d Cir. 2015) (internal citation and quotation marks omitted). Speech concerns a matter of public concern if it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 885–86 (3d Cir. 1997), *as amended* (Mar. 13, 1997) (citations omitted). Defendants seemingly concede, however, that Lt. Nieves-Hall was speaking as a citizen when she exercised her First Amendment rights, that she was speaking on a matter of public concern when she publicly supported Jeffries, and that there would have been no justification for their treatment of Lt. Nieves-Hall on the basis of her political statements (if that had occurred, of course).

Defendants collectively move to dismiss Lt. Nieves-Hall's § 1983 claim because she has not pleaded a deprivation of her own constitutional rights. (DE 3-1 at 16) Capt. Mos asserts that the complaint makes conclusory allegations that do not demonstrate misconduct on his part. (DE 11-2 at 7) Director Ambrose claims that Lt. Nieves-Hall's § 1983 claim must be dismissed because he is entitled to qualified immunity.[3] The City separately asserts that Lt.

---

[3]     Director Ambrose's briefing appears to address Lt. Nieves-Hall's § 1983 claims in conjunction with the NJCRA in sections III (DE 6-1 17–19) and VII (DE 6-1 at 31–32) of his moving brief and sections IV (DE 19 at 10–13) and VII (DE 19 at 15) of his reply brief. Director Ambrose also conflates Lt. Nieves-Hall's First Amendment retaliation claim with a a substantive due process cause of action that would require deprivation of a specifically identified property interest. (*See, e.g.*, 6-1 at 17–18). That is not the claim Lt. Nieves-Hall is making. "Unlike Fourteenth Amendment due process rights, appellant's First Amendment right to be free from retaliation for speech is not

8

Nieves-Hall has failed to allege the *Monell* prerequisites for municipal liability, *i.e.*, that she has not alleged that Capt. Mos and Director Ambrose acted pursuant to "some custom or policy of the City to deprive her of her constitutional rights." (DE 3-1 at 17)

Lt. Nieves-Hall responds that her complaint sufficiently alleges that she was "retaliated against" for publicly supporting an unsuccessful mayoral candidate. (*Id.* at 15–16) As a result of these First Amendment activities, she says, Capt. Mos and Director Ambrose subjected her to abusive behavior, denying her three separate job placements and ignoring her formal complaints. (*Id.* at 17) To establish causation, she relies on the temporal proximity of this behavior to her political activities. (*Id.* at 18).

### 1. Capt. Mos's liability under § 1983

Construing the allegations as I must in Lt. Nieves-Hall's favor, I find that she has alleged sufficient facts to state a First Amendment claim under Section 1983 against Capt. Mos. Her exercise of her First Amendment right to speak in favor of a political candidate is constitutionally protected speech on a matter of public concern. She asserts that after exercising this right she suffered abuse from Capt. Mos for years, including physical threats on one occasion. (Compl. ¶ 18) The retaliation, she alleges, included her being denied three job placements. The causation element, in particular, is one of fact, requiring development in discovery. It remains to be proved, but it has been alleged.

At this early stage of the proceedings, these allegations are sufficient, and Capt. Mos's motion to dismiss Count 1 is denied.

### 2. Director Ambrose's liability under § 1983

Lt. Nieves-Hall alleges that Director Ambrose retaliated because, although aware of Capt. Mos's actions, he "abandoned the plaintiff and let her continue to be subjected to" Capt. Mos's behavior. (Compl. ¶ 22) In addition, Director Ambrose allegedly denied her three other job placements without any

defeated by the lack of a property or liberty interest in his employment." *Latessa v. New Jersey Racing Commission*, 113 F.3d 1313, 1319 (3d Cir. 1997) (citation omitted).

9

justification. (Compl. ¶¶ 26–28) Director Ambrose replies that there are no factual allegations that he personally took any action to violate Lt. Nieves-Hall's constitutional rights, and that in any event he is entitled to the protection of the affirmative defense of qualified immunity. (DE 6-1 at 17, 31)

### a. Supervisor liability under § 1983

A supervisor may be held liable under Section 1983 if that supervisor was "involved personally, meaning through personal direction or actual knowledge and acquiescence, in the wrongs alleged." *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)); *see also A.M. ex rel J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)("A supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.").

The complaint sufficiently alleges that Director Ambrose was aware of and acquiesced in Capt. Mos's acts. It also alleges that Director Ambrose directly participated in the retaliation by denying her three separate job placements as a result of her political activities. Director Ambrose's supervisory liability is therefore adequately alleged.

### b. Qualified Immunity

I turn to Director Ambrose's invocation of the affirmative defense of qualified immunity. "The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

Qualified immunity issues (such as whether a violation was "objectively apparent" under the circumstances at the time) may require the kind of factual context that is available only on summary judgment or at trial. Nevertheless,

when a qualified immunity issue is raised on a motion to dismiss, the court is obligated to address it. "'[U]nless the plaintiffs allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Thomas*, 463 F.3d at 291 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). As *Thomas* implies, at the pleading stage such a clear violation need only be alleged, not proven. "The focus of the qualified immunity inquiry is on the allegations. . . ." *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014).

The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679. Even if there are fact questions as to the first, constitutional-violation prong, the court is required to decide the second, *i.e.*, whether the right was clearly established. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established.").

As discussed, *supra*, the complaint adequately alleges that Director Ambrose participated in the violation of a federal constitutional right.

The second prong of the qualified immunity analysis asks whether the right was so clearly established that Director Ambrose should have known that he was committing a constitutional violation under the circumstances. Here, I find that a reasonable person in Director Ambrose's position should have known that (if the allegations are correct, of course) he was violating Lt. Nieves-Hall's First Amendment rights when he allegedly took adverse acts as a result of her political activities outside of work. "Since at least 1967, 'it has been

settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 993 (3d Cir. 2014) (citations omitted). In *Bennis v. Gable,* the U.S. Court of Appeals for the Third Circuit stated that "as of 1982 the law was clearly established that a public employee could not be demoted in retaliation for exercising his rights under the first amendment." 823 F.2d 723 (3d Cir.1987); *see also, Zamboni v. Stamler,* 847 F.2d 73, 80 (3d Cir.1988) ("Defendants' argument that Zamboni's First Amendment rights were not clearly established at the time the action occurred cannot be sustained in light of this court's line of precedent on public employees' protected speech.") (citations omitted). Thus, the First Amendment right at issue here was "clearly established" at all times relevant to this dispute.

Count 1 states a claim against Director Ambrose for First Amendment retaliation, and he is not entitled to dismissal on the basis of qualified immunity. In these respects, his motion to dismiss is denied.

### 3. The City's liability under 1983

Count 1 is asserted against all three defendants, including the City. Count 6 separately alleges a First-Amendment-based 1983 claim against the City alone, for reasons not entirely clear. The City moves to dismiss both, asserting that the complaint fails to "provide a scintilla of factual support that the [individual] defendants acted pursuant to some custom or policy of the City to deprive her of her constitutional rights." (DE 3-1 at 17)

The standard for municipal liability for actions of employees was delineated in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Section 1983 liability cannot be predicated on *respondeat superior. See id.* at 694; *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parrat v. Taylor*, 451 U.S. 527, 537 n. 3 (1981)). Rather, it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the

injury . . . [that] the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694. The two paths to *Monell* liability, then, are municipal "policy" or "custom."

"'Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict.' Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990) (citations omitted). Allegations of "continued official tolerance of repeated misconduct" and that the municipality has done nothing to end or change the practice, supports a finding of a custom attributable to the municipality. *Id.* at 851–52.

Lt. Nieves-Hall points to no officially announced policy; presumably her theory is one of *de facto* policy, or custom. She alleges that she filed complaints with the Newark OAA, which declined to act. (Compl. ¶ 24) The complaint alleges official tolerance and even involvement at the fairly high level of the Director of Public Safety. The entire course of conduct is alleged to stem from the plaintiff's failure to support the Mayor. I therefore find that Count 1 sufficiently alleges municipal liability.

Count 6 seemingly rests on the same facts as Count 1. Here, however, the alleged municipal policy or custom consists of a failure to train or supervise municipal employees. In these circumstances, Section 1983 liability requires a showing that the failure amounts to "deliberate indifference" to the rights of persons with whom those employees will come into contact. *City of Canton v. Harris,* 489 U.S. 378, 388 (1989). The Third Circuit has explicated the *Canton* holding as follows:

> The Court in *Canton* observed that failure to train may amount to deliberate indifference where the need for more or different training is obvious, and inadequacy very likely to result in violation of constitutional rights . . . . For example, if the police often violate rights, a need for further training might be obvious.

*Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999).

A liability-creating "policy" may stem from a failure to properly train personnel. Such a theory, however, is a "most tenuous" basis for liability. *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359 (2011). In *Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. 2014), the Court of Appeals helpfully summarized the elements of such a "failure-to-train" claim:

> Where the policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("Canton")). Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury;" or in other words, "the deficiency in training [must have] actually caused" the constitutional violation. *Canton*, 489 U.S. at 391.

*Id.* at 222.

Count 6 alleges no facts about the training, or not, of the City employees allegedly responsible. It fails to identify any particular failure to train; it simply hypothesizes that it must have occurred. That is an insufficient allegation. Stripped of the failure-to-train allegation, Count 6 adds nothing to Count 1. Count 6, which is alleged only against the City, is therefore dismissed.

### B. Count 2 (All defendants) – NJCRA claim

The second count alleges a violation of state constitutional protections analogous to the First Amendment under the New Jersey Civil Rights Act ("NJCRA"). The NJCRA, N.J. Stat. Ann. § 10:6-2(c), provides that "[a]ny person who has been deprived of any substantive rights, privileges or immunities secured by the Constitution or laws of this State by a person acting under color of law, may bring a civil action for damages."

The New Jersey State Legislature, when it enacted the NJCRA, intended it to parallel 42 U.S.C. § 1983, and sought to incorporate existing § 1983 jurisprudence. *Perez v. Zagami*, 218 N.J. 202, 515 (2014); *see also RaCapt. Mos v. Flowers*, 429 N.J. Super. 13, 23 (App. Div. 2012) (stating that NJCRA was

"modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights." (citations omitted)). Thus, the NJCRA is construed nearly identically to Section 1983.

The parties have not suggested any distinction between the Count 2 claims under NJCRA and their Count 1 counterparts under 42 U.S.C. § 1983. Therefore, for the reasons outlined in II.A, *supra*, defendants' motions to dismiss Count 2 are denied.

### C. Count 3 (All defendants) – CEPA claim

Lt. Nieves-Hall alleges that all defendants violated CEPA, the "whistleblower statute."

#### i. Legal standards under CEPA

CEPA was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994). To effectuate that aim, the statute provides, in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following: ...
> (c) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...; or
>> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare....

N.J. Stat. Ann. § 34:19-3. A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). To make out such a CEPA claim, a plaintiff must demonstrate four elements:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he or she performed a "whistle-blowing" activity described in N.J. [Stat. Ann. §] 34:19–3c;

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003) (line breaks added).

A plaintiff alleging a CEPA violation need not prove that law or public policy was actually contravened—rather, the plaintiff "must show that he or she 'reasonably believes' that to be the case." *Id.* at 900. Thus the complaint need not establish such a violation factually. *See id.* at 901 (citing *Blackburn v. United Parcel Serv., Inc.*, 3 F.Supp.2d 504, 514 n. 5 (D.N.J. 1998) (Barry, J.), *aff'd on other grounds*, 179 F.3d 81 (3d Cir.1999)). Nevertheless—and this is an issue of law for the court—the whistleblowing must relate to an identifiable "law, or a rule or regulation promulgated pursuant to law" N.J. Stat. Ann. § 34:19-3c(1), or else "a clear mandate of public policy concerning the public health, safety or welfare," N.J. Stat. Ann. § 34:19-3c(3); *Dzwonar*, 828 A.2d at 900–01.

A "retaliatory action," for purposes of CEPA, "means the discharge, suspension, or demotion of an employee, or other adverse employment action taken against an employee in terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Interpreting that language, some courts have held that the employer's action must affect the employee's compensation or rank, or "be virtually equivalent to discharge." *Klein v. Univ. of Med. & Dentistry of New Jersey*, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005); *see also Caver v. City of Trenton*, 420 F.3d 243, 249 (3d Cir. 2005). Other decisions, with which I agree, have taken a somewhat broader view. Examples of actionable retaliatory acts have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements

and facilities," and altered "promotional procedures." *Beasley v. Passaic County*, 873 A.2d 673, 685-86 (N.J. Super. Ct. App. Div. 2005); *see also Smith v. Twp. Of E. Greenwich*, 519 F. Supp. 2d 493, 511 (D.N.J. 2007) *aff'd*, 344 F. App'x 740 (3d Cir. 2009), as amended Nov. 3, 2009 (quoting same language).

Alternatively—*i.e.*, short of discharge, suspension, or demotion—an adverse employment action may be established by "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." *Green v. Jersey City Bd. of Ed.*, 828 A.2d 883, 891 (N.J. 2003); *Maimone v. City of Atl. City*, 903 A.2d 1055, 1063–64 (N.J. 2006); *Nardello v. Twp. of Voorhees*, 873 A.2d 577, 580 (N.J. Super. Ct. App. Div. 2005). By analogy to a Title VII hostile work environment, we might call this a retaliatory environment.

### ii. Discussion of CEPA Claim

For dismissal of the CEPA claim, defendants assert two grounds: (1) statute of limitations and (2) failure to state a claim. I discuss these in turn.

#### 1. Statute of limitations

Defendants argue that Lt. Nieves-Hall's CEPA claim is time-barred under CEPA's one-year statute of limitations. Lt. Nieves-Hall counters that she alleges three denials of job opportunities in 2018, within the limitations period, in retaliation for her having filed complaints with the Newark OAA. The earlier retaliatory conduct beginning in April 2016, she says, was part of a continuing violation and therefore should be treated as timely. (DE 15 at 26–27)

The statute of limitations, although an affirmative defense, may be raised on a Rule 12(b)(6) motion if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)); *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989). "If the bar

is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel*, 570 F.2d at 1174.

For a CEPA claim, the statute of limitations is one year. N.J. Stat. Ann. § 34:19-5. In general, an act of retaliation is what perfects a CEPA claim. A CEPA claim therefore accrues, and the one-year limitations period begins to run, on the date of the retaliatory employment action that is the basis for the claim. *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 466-67 (D.N.J. 2009).

Because the initial action was filed on November 14, 2018, any CEPA cause of action that accrued after November 14, 2017 would be timely. The only alleged acts of retaliation within the limitations period were the final, 2018 denials of three job opportunities or transfers.

Lt. Nieves-Hall alleges that the earlier acts of retaliation are nevertheless timely asserted, because they were not discrete, but part of a "continuing violation" that extended into the limitations period. The "continuing violation" doctrine is "an equitable exception to the statute of limitations"; it provides that, where "an individual experiences a continual, cumulative pattern of tortious conduct," the limitations period may be tolled "until the wrongful action ceases." *Roa v. Roa*, 985 A.2d 1225, 1231 (N.J. 2010). Thus the continuing violation doctrine "allows a plaintiff to pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." *Sarno v. Wal-Mart Stores E., L.P.*, No. CIV.A. 12-002075 JAP, 2012 WL 5880361, at *4 (D.N.J. Nov. 20, 2012) (quoting *Smith v. Twp. of E. Greenwich,* 519 F. Supp. 2d 493, 505 (D.N.J. 2007) (quotations and citations omitted)). It is well settled that the continuing violation theory, which is common to antidiscrimination statutes, applies to CEPA. *Green*, 828 A.2d at 891–92.

The scope of the continuing violation theory, however, has been confined by case law; it is not a catchall for time-barred claims. *See Roa,* 985 A.2d at 1233. In applying the continuing violation theory to CEPA, the New Jersey

Supreme Court in *Green, supra,* adopted the restrictive analytical framework defined in *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002), a federal Title VII case. *See also Roa,* 985 A.2d at 1231–32 (adopting *Morgan* analysis for analogous claim under New Jersey Law Against Discrimination). Within the *Morgan* framework, the essential question is whether the acts of retaliation are discrete (and therefore independently actionable) or nondiscrete (and therefore actionable only as part of a series of events). If discrete, they accrue and trigger the statute of limitations when they occur; if nondiscrete, they may be timely if they continued into the limitations period.

In *Morgan,* the plaintiff alleged both discrete retaliatory/discriminatory acts and a nondiscrete claim of a racially hostile work environment. For statute of limitations purposes, the Court drew a key distinction. A hostile environment claim, it held, could be considered a continuing violation because it is "a series of separate acts that collectively constitute one 'unlawful employment practice'" under the substantive law. 536 U.S. at 117. In contrast, claims based on discrete acts made actionable under the statute in question would not be analyzed collectively:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [statutorily prescribed] time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id.* at 113 (quoted in *Roa,* 985 A.2d at 1231–32).

As the Third Circuit has confirmed, *Morgan* promulgated a "bright-line" rule that "individually actionable allegations cannot be aggregated" for purposes of the continuing violation doctrine. *O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir. 2006). Such independently actionable acts "are not

actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. In short, a plaintiff does not retain the option to aggregate acts that are discrete and actionable.

What acts, then, are regarded as discrete under CEPA? Roughly, actions such as dismissal, suspension, or demotion, or other actions affecting basic conditions of employment, upon which an independent CEPA claim can be based. *See* discussion, *supra*; N.J. Stat. Ann. § 34:19-2(e). Nondiscrete actions would encompass a series of less serious acts that would not be individually actionable but nevertheless, in the aggregate, add up to a unitary, actionable pattern of retaliation. *See Green*, 828 A.2d at 891.

Judge Joel Pisano of this District (now retired) summarized the range of "discrete" CEPA claims thus:

> Plaintiff's claims cannot be saved under the continuing violation theory because an employer's failure to promote is quintessentially a discrete employment action. [citing *Morgan*, 536 U.S. at 113–115] ("Each discrete discriminatory act starts a new clock for filing charges alleging that act. Discrete acts such as ... failure to promote ... are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' "); *see also Rush v. Scott Specialty Gases*, 113 F.3d 476, 483–84 (3d Cir.1997) (holding that plaintiff's failure to promote claim and train claims are "discrete instances of alleged discrimination that are not susceptible to a continuing violation analysis."). Likewise, retaliatory discipline actions are considered discrete employment actions. [citing *O'Connor*, 440 F.3d at 127] (following *Morgan* and discussing types of discrete acts that are not susceptible to the continuing violations doctrine, including "wrongful discipline" and "failure to promote"); *see also Gadson v. City of Wilmington Fire Dep't*, 478 F. Supp. 2d 635 (D.Del.2007) (holding that plaintiff's claims of "disparate treatment in defendant's imposition of discipline, as well as 'hiring and promotional policies and practices' which have a disparate impact" are discrete acts that "cannot be aggregated under a continuing violations theory").

*Sarno*, 2012 WL 5880361, at *4. I take Judge Pisano's summary as a guide in analyzing Lt. Nieves-Hall's claims.

Lt. Nieves-Hall claims, *inter alia,* that in the 2016–17 period the defendants created an abusive environment. She alleges, *inter alia,* that (i) on October 7, 2016, Capt. Mos physically threatened her (Compl. ¶ 18); (ii) she outlines various calls she received from Capt. Mos from April 2016 through October 2016 (*id.* ¶¶ 81-85); and (iii) from April 2016 through the filing of the complaint, Capt. Mos used subordinates to subvert her authority and embarrass her. (*Id.* ¶ 20) These did not involve changes to her job duties or status; they are not independently actionable adverse employment actions. Many of these acts occurred outside the limitations period. In addition, the sequence of the undated allegations in the complaint suggests that they *preceded* the plaintiff's filing of the OAA complaint, which is the primary alleged act of whistleblowing. That is not to say, however, that a fact finder might not hear evidence of the earlier acts to the extent they are relevant to the 2018 adverse employment actions.

The three denied transfers in 2018 would qualify as actionable adverse employment actions. Each was discrete and actionable, and it triggered the one-year limitations period. *See Shepherd v. Hunterdon Developmental Ctr.,* 803 A.2d 611, 627 (N.J. 2002) (holding that an unwelcome transfer is a discrete act). Because they occurred after November 14, 2017, they were asserted timely. Because they apparently occurred after the plaintiff's filing of the OAA complaint, they could plausibly be viewed as retaliatory.

The motion to dismiss the CEPA claim on statute of limitations grounds is therefore denied to the extent that the three transfer decisions in 2018 are allegedly retaliatory.

### 2. Failure to state a claim

Timeliness aside, defendants move to dismiss Lt. Nieves-Hall's CEPA claim for failure to state a claim. (*See, e.g.,* DE 6-1 at 19–29). Defendants assert that the complaint fails to identify any illegal conduct that the plaintiff complained about, the complaint does not outline what adverse employment

action took place, and they question any causal connection between the two. (*Id.*)

Lt. Nieves-Hall asserts that the complaint adequately alleges each element of a CEPA claim. (DE 15 at 27) She says the complaint outlines facts that support an objectively reasonable belief that a violation had occurred and she performed whistle-blowing activities when she complained to Newark OAA that Capt. Mos had physically threatened her and when she complained that her First Amendment rights were being violated. (*Id.* at 28–29) She further alleges that adverse employment action was taken against her when she was denied various job transfers and alleges that these denials were the result of her whistle-blowing activities.[4]

Here, Lt. Nieves-Hall has sufficiently alleged that she reasonably believed that Capt. Mos's behavior violated various laws, including that he had committed violations of N.J. Stat Ann §§ 2C:12-1 (assault), 2C:33-2 (disorderly conduct), and 2C:33-4 (harassment). (Compl. ¶ 18) She reported this conduct, as well as the alleged First Amendment violations, by filing complaints to the OAA. (*Id.* ¶ 24) And, as detailed in Section II.C.ii.1, *supra*, Lt. Nieves-Hall has adequately alleged for purposes of a motion to dismiss that adverse employment actions were taken by Capt. Mos and Director Ambrose as a result of her filing complaints against Capt. Mos.

The motion to dismiss Count 3, as I have interpreted and limited it here, is therefore denied.

### iii.    CEPA's Waiver Provision

Capt. Mos and the City collectively argue that Count 2, the New Jersey Civil Rights Act ("NJCRA") claim, should be dismissed because it was waived by virtue of Lt. Nieves-Hall's assertion of a CEPA claim. Capt. Mos separately moves to dismiss Count 4, the Intentional Infliction of Emotional Distress ("IIED") claim as being similarly waived under CEPA.

---

[4]    As noted above, the Complaint (¶24) does not specify the date of the OAA complaint, but its placement in sequence suggests that it was filed *after* the allegedly "retaliatory" acts of harassment in 2016–17.

CEPA explicitly provides that instituting a claim of retaliation under CEPA waives any claim of retaliation under another state law:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J. Stat. Ann. § 34:19–8. CEPA does not provide for waiver of claims under "any law" or under "federal law." The plain wording of the statute, then, effectuates a waiver of State claims, not federal claims. The nature and structure of CEPA also implies that the waiver should be construed literally and narrowly. CEPA explicitly provides that it is not meant to alter other legal rights and privileges possessed by employees. N.J. Stat. Ann. § 34:19–8 ("Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law. . . .").

Defendants assert that pursuant to CEPA's waiver provision, Lt. Nieves-Hall's NJCRA and her common law tort IIED claim must be dismissed at the motion to dismiss stage. (*See, e.g.,* DE 3-1 at 5) Defendants point to case law dismissing an NJCRA claim when pled with a CEPA claim because they required similar proofs. (*Id.* (citing *Matthews v. New Jersey Institute of Technology*, 717 F.Supp 2d 447 (D.N.J. 2010)).

Lt. Nieves-Hall counters that she need not elect her remedies before discovery is complete. (DE 15 at 10–11) I agree.

In *Young v. Schering Corp.*, 141 N.J. 16 (N.J.1995), CEPA's waiver provision was interpreted to mean that instituting a claim under CEPA will waive any state law claim that is "substantially related," in the sense of requiring the same proofs. In reliance on *Young*, the New Jersey Appellate Division has held that the CEPA waiver provision must be interpreted to deem other causes of action waived only after a plaintiff has a meaningful opportunity to gather facts and identify those "proofs." *Maw v. Advanced*

*Clinical Comms.*, 359 N.J. Super. 420, 440 (App. Div. 2003), *rev'd on other grounds*, 179 N.J. 439 (2004) ("We take this language to mean that before electing remedies, a plaintiff should have an opportunity to complete discovery. Only after gaining access to all of the facts, will a plaintiff be in a position to make a knowing and meaningful election."); *see also Flaherty v. Enclave*, 255 N.J. Super. 407, 411 (Law. Div. 1992) ("Defendant argues that once plaintiff institutes his CEPA claim, he is required to waive all of his remaining rights and remedies against defendants arising out of the employment relationship. This appears, however, to be an overly broad construction of the statutory language."). Indeed, the cases cited by defendants seem to involve CEPA-waiver dismissals at the stage of summary judgment or trial. (DE 3-1 at 5 (citing *Ehling v. Monmouth-Ocean Hospital Service Corp.*, 961 F. Supp.2d 659 (D.N.J. 2013) (granting summary judgment dismissed certain claims pursuant to CEPA's waiver provision); *Beasley v. Passaic County*, 377 N.J. Super 585 (App. Div. 2005) (dismissing IIED claim subject to CEPA's waiver provision at close of the case at trial).

I will not hold, at this stage in the proceeding, that Lt. Nieves-Hall has waived her NJCRA or common law tort claims by also filing a CEPA claim. This ruling is without prejudice, however, to renewal of this argument at the close of discovery, when the overlapping-proofs issue will be clear.

### D. Count 4 (All defendants) – Worker Freedom from Employer Intimidation Act claim

Lt. Nieves-Hall alleges that all defendants violated New Jersey's Worker Freedom from Employer Intimidation Act (N.J. Stat. Ann. § 34:19-9, *et seq.*) by "requiring the plaintiff to participate and communicate with them, the purpose of which was to communicate Director Ambrose and Capt. Mos's opinions regarding the political beliefs and loyalties of both of them and the plaintiff." (Compl. ¶ 50). Defendants contend that this claim is irrelevant to the conduct as alleged here.

This act prohibits employers and their representatives from requiring their "employees to attend an employer-sponsored meeting or participate in any communications with the employer or its agents or representatives, the purpose of which is to communicate the employer's opinion about religious or political matters." N.J. Stat. Ann. § 34:19-10.

Although other allegations of the complaint are incorporated by reference into Count 4, Lt. Nieves-Hall has not adequately pled facts to assert a violation of the New Jersey Worker Freedom from Employer Intimidation Act. Lt. Nieves-Hall alleges that she was punished for her own political beliefs, not that she was coerced into participation in the employer's dissemination of its own political beliefs.

The motion to dismiss Count 4 will therefore be granted.

### E. Count 5 (Capt. Mos) – IIED Claim

Lt. Nieves-Hall asserts one count of intentional infliction of emotional distress against Capt. Mos only. The asserted emotional distress consists of mental anguish and embarrassment as a result of various harassing actions.

The New Jersey Supreme Court has laid out the essential elements of IIED:

> [T]he plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe . . . the defendant's conduct must be extreme and outrageous. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366-67, 544 A.2d 857, 863 (1988) (internal citations omitted); *see also Delio Russo v. Nagel*, 817 A.2d 426, 435 (App. Div. 2003). The distress "must be sufficiently substantial to result in either physical illness or serious psychological sequelae." *Turner v. Wong*, 363 N.J. Super. 186, 832 A.2d 340, 348 (2003). "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of

emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988), *cert. denied*, 498 U.S. 811 (1990).

Lt. Nieves-Hall fails to allege that "extremely rare" set of facts. Capt. Mos's conduct as alleged, however severe, unfortunate, or violative of other laws, does not give rise to an IIED claim.

The motion to dismiss Count 5 is granted.

### IV. Conclusion

For the reasons provided above, defendants' motions to dismiss (DE 3, 6, 11) are granted in part and denied in part.

Count 4, asserted against all defendants, Count 5, asserted against Capt. Mos, and Count 6, asserted against the City, are dismissed. The motions are in all other respects denied.

An appropriate order follows.

Dated: September 26, 2019

**Kevin McNulty**
**United States District Judge**